IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
September 20, 2006 Session

**IN RE MIKAYLA GRACE CLARK**

**SAMUEL KENT CLARK**
**v.**
**LEAH JOY CERDEN**

**An Appeal from the Juvenile Court for Madison County**
**No. 34-0261     Christy R. Little, Judge**

_____

**No. W2005-01687-COA-R3-JV - Filed January 22, 2007**

_____

This is a child custody dispute. The biological parents of the child involved in this action met in Georgia, where the child was born in December 2002. The parties lived together with the child, but never married. Initially, the parties moved several times with the child, following job opportunities for the father. When the child was about nine months old, the parties moved to Jackson, Tennessee. Not long after that, the mother and the child returned to Georgia to live with the mother's parents in Georgia, in order for the mother to seek professional help for depression. About nine months later, after an altercation between the mother and the child's maternal grandmother, the mother told the father that she could not care for the child and asked him to assume custody. Accordingly, the father took the child to live with him in Jackson. About two months later, the father filed the instant petition for legitimation of the child and to seek custody. The mother opposed the father's petition and filed a counter-petition for custody. After a hearing, the trial court determined that the father was comparatively more fit than the mother and designated him as the primary residential parent. The mother now appeals. We affirm, finding that the evidence does not preponderate against the trial court's determination.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which W. FRANK CRAWFORD, P.J., W.S., and DAVID R. FARMER, J., joined.

Sam J. Watridge, Humboldt, Tennessee, for the appellant, Leah Joy Cerden.

Harold F. Johnson, Jackson, Tennessee, for the appellee, Samuel Kent Clark.

**OPINION**

The parents of the child involved in this action are Petitioner/Appellee Samuel Kent Clark ("Father") and Respondent/Appellant Leah Joy Cerden ("Mother"). They met while Father was attending chiropractic school in Georgia. At the time, Father was thirty-four years old, and Mother was twenty-three years old and living with her parents in a town near Atlanta, Georgia. On December 7, 2002, Mikayla Grace Clark ("Mikayla" or "the child"), the child involved in this action, was born. When Mikayla was born, Mother and Father were both living with Mother's parents in Georgia.

After their daughter was born, problems developed in the parties' relationship. Within a nine-month period, the parties moved several times. When Mikayla was about one week old, Father, Mother, and Mikayla moved to Kentucky to live with Father's parents. Soon thereafter, they moved to Alabama, then back to Kentucky, and then to Jackson, Tennessee.

Within weeks after the move to Jackson, Mother moved with Mikayla to her parents' home in Georgia, and Father visited them frequently on weekends. Unfortunately, Mother and her mother, Charlene Cerden ("Grandmother"), had a volatile relationship. On Father's last visit to Georgia on Easter weekend, approximately April 11, 2004, an altercation erupted between Mother and Grandmother. When Father entered Mother's parents' home just after the altercation, he found Mother in the kitchen holding the child. Mother was on the floor crying and asked Father to take Mikayla temporarily to live with him in Jackson. Father complied with her request and took the child to live with him. While Father had custody, Mother visited Father and Mikayla in Jackson.

Meanwhile, the relationship between Father and Mother continued to deteriorate. In December 2003 and February 2004, Father asked Mother to marry him, but she declined. Father told Mother that he would not close the door on their relationship, but that he intended to move forward with his life. At some point, Father began to date other women.

On May 29, 2004, Mother appeared at Father's apartment door in Jackson and told him that she intended to live in Jackson. Father was not pleased. For about two weeks, Mother lived with Father and Mikayla. After that, she signed a one-year lease for an apartment near Father's home. When Mother moved out of Father's home in June 2004, Mikayla remained with Father.

Meanwhile, on June 1, 2004, Father filed a petition in Georgia state court for legitimation of Mikayla, to establish visitation rights and child support obligations, and to modify custody. On June 24, 2004, Father filed a petition in the Tennessee juvenile court below that was similar to the petition filed in Georgia. The petition filed in the Tennessee trial court acknowledged that a similar petition had been filed in Georgia, but averred that the Georgia petition would be dismissed when the Tennessee trial court accepted jurisdiction over the child. The Georgia petition stated that Mother resided with the child in Georgia, but the petition filed in the Tennessee trial court stated that Mother and Mikayla lived in Jackson, Tennessee. Based on Father's petition, the Tennessee trial court issued a temporary injunction, restraining Mother from removing the child from the county

other than for visits with her parents in Georgia. On June 25, 2004, the Georgia petition was voluntarily dismissed.

On June 27, 2004, after the Georgia petition was dismissed, Mother filed in the Tennessee trial court below an answer and counter-petition asking to be designated as primary residential parent. In her counter-petition, Mother averred that she "is not certain this Court has jurisdiction of the Respondent and requests the Court to review the requirements prior to adjudicating the case."

On August 3, 2004, the trial court entered an agreed order establishing the parties' respective parenting time pending resolution of the litigation. Under the order, Father remained the primary residential parent and Mother was given a set visitation schedule.

On November 2, 2004, Mother filed a motion to dismiss for lack of jurisdiction. Mother argued that she resided and was domiciled in Georgia, and that the child was also a legal resident of Georgia. She said that she was temporarily residing in Tennessee only because Father had taken the child to Tennessee. She conceded that the Tennessee trial court had subject matter jurisdiction, but claimed that it did not have personal jurisdiction over either her or Mikayla pursuant to Tennessee Code Annotated § 36-2-307, which governs jurisdiction in such matters. In response, Father maintained that Mother had submitted to the jurisdiction of the Tennessee court by filing her answer and counter-petition. Father also noted that the Georgia petition had been dismissed.

On February 3, 2005, the trial court entered an order appointing a guardian ad litem ("GAL") for the child. On March 17, 2005, another order was entered clarifying that the appointment of the GAL was based on the complexity of the case.

On the same date, the trial court held a hearing on Mother's motion to dismiss for lack of jurisdiction. The appellate record does not include a transcript of the hearing. On February 9, 2005, the trial court entered an order denying Mother's motion to dismiss, concluding simply that "jurisdiction of this matter lies in the [Tennessee trial court]."

On March 29, 2005, a bench trial was conducted on the parties' petitions. At trial, Mother conceded that Father was, in fact, Mikayla's biological father, so the primary issue that remained for trial was the designation of the primary residential parent. On the morning of trial, Father's counsel announced to the trial court that Father intended to move to Kentucky with Mikayla to open a chiropractic practice there. Until it was announced in open court, Mother was unaware of Father's planned move.

Father testified at the outset. He said that he is the youngest of thirteen children, and that most of his family lives in Wingo, Kentucky. He explained that he was raised by his maternal grandparents, who adopted him when he was born, and his own mother was raised as his sibling. Father's grandfather/adopted father died three years prior to trial. From time to time, he said, his grandmother/adopted mother, Grace Clark ("Mrs. Clark"), has helped him care for Mikayla. Father

stated that, when he and Mikayla visit Kentucky, his family welcomes her with "open arms and excitement."

Father's relationship with Mother began before he graduated from chiropractic school. According to Father, after Mother learned that she was pregnant, the relationship became strained and Mother withdrew from him. Father testified that he offered to take the child and raise her by himself. Instead, the parties decided to move in with Mother's parents, who lived in a large house. They stayed there for about six weeks. When Mikayla was about one week old, Father said, the parties moved from the Mother's parents' home because of an argument between Mother and Grandmother regarding Father. Father commented that he and Grandmother "just did not agree on hardly anything." At that time, the parties moved from Georgia to Kentucky to stay with Mrs. Clark.

About one month after their move to Kentucky, Father testified, a job opportunity for Father arose in Birmingham, Alabama, so the parties moved there. Mother was initially excited about the move to Alabama, but soon after they arrived, she became very depressed and withdrawn, and asked Father to move once again. So after about three months, the parties moved back to Kentucky to live with Mrs. Clark. The parties stayed in Kentucky for about five months, and Father worked odd jobs with family members in construction and farming to support himself, Mother, and Mikayla. A job opportunity for Father in the chiropractic field then arose in Jackson, Tennessee, so the parties moved into an apartment in Jackson. At the time, Mikayla was about nine months old. Father said that Mother was initially excited about the move because "it would be a new start for her."

About two weeks after the move to Jackson, Father said, Mother again became very depressed. He said that Mother then moved with Mikayla back to her parents' home in Georgia so that Mother could obtain psychological counseling. At that time, Mother assured Father that she and Mikayla would return to Jackson in October 2003. Mother, however, did not return to Jackson in October but instead extended her projected return date, first until Thanksgiving and then until Christmas. Despite Mother's reassurances that she and Mikayla would return to Jackson, she did not return at Christmas 2003, because she was not sufficiently emotionally stable and she wanted to continue her psychological counseling in Georgia. During this time, Father traveled to Georgia on the weekends to see Mother and Mikayla.

Father testified that, in December 2003, he asked Mother to marry him, but she declined. At that time, Father told Mother that, while he was not closing the door on their relationship, he had to move on with his life. In February 2004, Father again asked Mother to marry him, and she again declined. Father admitted that when he asked Mother to marry him in February 2004, he had been intimate with another woman. He explained that he wanted to see know Mother's intentions before he moved on with his life.

Father testified about his visit to Georgia to see Mother and Mikayla on Easter weekend in April 2004. Father had been with Mikayla on Easter morning. He brought Mikayla back to Grandmother's house and then left for Jackson. About ten minutes after he left for Jackson, he said, he called Mother on the telephone because he had a feeling that "something wasn't right . . . between

-4-

[Mother] and her parents." Mother told him that her parents had just thrown her out of the house. He offered for Mother and Mikayla to return to live with him in Jackson until Mother could find a place of her own, but Mother rejected this offer. Father returned to Mother's parents' home and found that, near Mikayla's high chair, the child's "[b]owl, cereal, milk, everything was everywhere." According to Father, Mother then collapsed on the floor crying, handed Mikayla to him, and told him to take Mikayla with him. Father said that Mother told him that "she wasn't capable of taking care of herself, much less a baby a year-and-a-half old; take her, she's yours." Father then took Mikayla to Jackson with him, and Mrs. Clark came from Kentucky to Jackson for the first week to help him with child care until he could make other arrangements.

After that, the parties discussed the feasability of Mother moving to Jackson. Father testified that he was in favor of Mother moving back to Jackson to be close to Mikayla, but that he also knew that they could not live together. Unexpectedly, on about May 29, 2004, Mother appeared at Father's apartment saying that she had decided to move to Jackson. Soon after Mother moved to Jackson, Father said, they had an argument. Father said that, during the argument, Mother "went through the entire apartment, knocking everything off the cabinets, everything in sight off, going upstairs and doing the same." He said that Mother kept saying that she "was tired of all this; she just wanted it to end. She wanted everything to end." He said that Mother told him that she wanted to "run off into the road construction and end everything." This behavior caused Father to seek a restraining order to prevent Mother from traveling with Mikayla.

Eventually, Mother moved out of Father's apartment and found another place to live in Jackson. The parties agreed that Mother would have visitation with Mikayla on alternate weekends. Father later discovered that, when Mother had weekend visitation, she took Mikayla to Georgia to stay with her parents.

In his testimony, Father confirmed that, after the trial, he intended to move back to Kentucky with Mikayla. He explained that he was beginning his own chiropractic practice there, and that the construction work on his future office was scheduled to be completed in May 2005. Father had already enrolled Mikayla in a local daycare center. He acknowledged in his testimony that he did not tell Mother about his intention to move until the announcement was made in open court.

Father was asked about the debt stemming from his new business venture, as well as his past debts. Father said that he borrowed about $200,000 for business start-up costs, and that he still owed $150,000 in student loans. Father also acknowledged that he owed certain individuals for funds he had convinced them to invest in a bogus tobacco scheme out of Mexico. When he persuaded the individuals to invest, Father said, he promised them that he would pay them back for any losses. Substantial losses were incurred, and Father estimated that the amount he owed from this ill-fated venture, coupled with the amount that he owed on his car, totaled about $50,000. Thus, at the time of trial, Father had a total debt of approximately $400,000. Father also admitted that he had been charged twice for driving while under the influence of alcohol. He explained that, on the first charge, he pled guilty to a lesser offense, and for the second charge he performed community service. He incurred both DUI charges prior to his graduation from chiropractic school.

Father asked the trial court to designate him as the primary residential parent because, he said, his household was more stable than that of Mother. He noted that Mother still lived with her parents, and asserted that this was a volatile environment. Father noted that he has been Mikayla's primary residential parent since April 2004, and that she was doing well in his custody. Father acknowledged that, at the time of trial, he and Mother were not getting along, but asserted that he nevertheless helped Mikayla speak with Mother over the telephone because "it is necessary for Mikayla to talk to her mother and not feel as though she is not there." He claimed that he gave Mother first priority with respect to babysitting Mikayla when he was away. He said that he was not seeking child support from Mother. Father acknowledged that he had incurred significant debt, but he asserted that, despite the debt, he was better able to care for Mikayla financially because of the start of his new business and his potential to earn more money than Mother. Father denied that Mikayla bit or hit him, as she did to Mother, but said that he felt that she was a typical two-year-old. Father maintained that he did not have alcohol in his home, nor did he drink in front of Mikayla. He said that he only drinks alcohol on the weekends when Mikayla is not residing with him.

Father's mother, Mrs. Clark, testified on Father's behalf. She stated that she has a stable family, and that family members call upon one another for assistance when the need arises. She said that she loves Mikayla and confirmed that she would be in a position to help Father care for Mikayla after they moved to Kentucky. Mrs. Clark testified that Father and Mikayla have a very loving relationship, and that he kept her on a schedule because he felt it was in the child's best interest. She corroborated Father's testimony that he does not keep alcohol in his home, and said that she had not seen Father drink around Mikayla. Having lived with Mother for several months, Mrs. Clark said that she knew Mother and commented that she was a "good mother in her own way." Mrs. Clark said that Mother loves Mikayla, and Mikayla loves Mother and is glad to see her when she comes to visit.

Father also offered the testimony of Wanda Williams ("Williams"), a caregiver in Mikayla's daycare center. She stated that Mikayla had been in her classroom for four months, and that for six weeks out of that four-month period, she cared for Mikayla at Father's home after hours until Father came home from work. Williams testified that Mikayla was always clean and properly dressed for daycare, and that she was a very happy, typical two-year-old with lots of friends at the daycare. She said that Mikayla has a "wonderful" relationship with Father, and characterized Father as an "outstanding dad."

Mother also testified at trial.[1] As background, Mother said that she graduated from high school in Maryland and then attended college in Ohio. After her parents moved to Georgia, she said, she moved in with them to attend college in Georgia under a scholarship program. After about a year into the program, she met Father and became pregnant with Mikayla. At the time of trial, Mother was continuing to maintain her apartment in Jackson, but said that in February 2005, she temporarily returned to Georgia to help her mother care for her maternal grandmother, who was recovering from

---

[1]Portions of Mother's deposition testimony were also read into the record at trial. In our discussion of Mother's testimony, we will not identify whether the testimony came from Mother's deposition or her trial testimony.

surgery on her foot. Mother acknowledged that she and Grandmother had had a tumultuous relationship, but indicated that they were "working things out." At the time of trial, Mother said, she was being supported financially by her maternal grandmother and her parents, and she had two job offers outstanding. She planned to live with her maternal grandmother in Georgia until she could become financially able to live on her own. She planned to continue her education in Georgia.

Mother corroborated Father's description of the parties' relocations in the first nine months of Mikayla's life. Mother explained that, when she became pregnant, she did not know Father very well, and she characterized their relationship as a work in progress. At the time, she thought that it was important for she and Mikayla to stay with Father, so she agreed to move from place to place with him. Mother added that, when the parties moved back to Jackson from Kentucky, Father was financially unstable. At that time, Mother said she made three of Father's truck payments, an insurance payment, and she also paid the deposit on the utilities for the parties' apartment.

Mother acknowledged that, after the parties' initial move to Jackson, she moved back to Georgia with Mikayla in order to seek counseling for her own depression. She explained that she had been undergoing counseling for psychological problems since middle school. While in middle school, Mother discovered that the man who had raised her was not her biological father, and she sought counseling to resolve issues related to that revelation. While in high school, Mother underwent counseling to deal with issues arising out of Grandmother's alcoholism, adding that Grandmother had been sober since 2001. Thus, when Mother's depression resurfaced after Mikayla was born, she thought it best to again seek counseling, while she and Father continued their relationship on a long-distance basis through telephone calls and visits.

Mother testified about her perception of the events on Easter morning 2004, when she asked Father to take Mikayla home with him. She agreed with Father's description of Grandmother's kitchen as a mess, and explained that it was because either she or Grandmother had thrown the child's cereal in anger. Mother stated that friction existed between Father and Grandmother, and that she felt that she was caught in the middle between them. Mother, who was suffering from depression at the time, lost patience with being told what to do by both Father and Grandmother. When she asked Father to take Mikayla, Mother said, she intended only to give him temporary custody until she could care for the child both emotionally and financially. Mother emphasized that she did not intend to relinquish permanent custody to Father.

When Mother moved back to Jackson in May 2004, she testified, she signed a one-year lease for an apartment in Jackson. At that time, she said, she simply hoped that she and Father could be civil to one another.

Mother then testified about why she would be a better primary residential parent than Father for Mikayla. Mother said that she has a bond with Mikayla, noting that she gave birth to her, named her, and breast fed her for nine months. She said that she shared Father's desire for Mikayla to be independent. Mother contrasted her efforts to facilitate a relationship between Father and Mikayla with Father's failure to facilitate a relationship between her and Mikayla. Mother noted that, when

she had custody, she allowed Father to have Mikayla for an entire week, and she welcomed Father into her parents' home when he visited on weekends during the time in which Mother and Mikayla were living in Georgia. Father, on the other hand, did not allow Mother to see the child every day when she moved to Jackson. She said that he restricted her parenting time, claiming that she did not fit into Mikayla's "routine." Mother recounted several occasions on which Father had another person babysit the child without first giving Mother the option of caring for her. She said that Father's failure to inform her of his intended move to Kentucky prior to trial indicated a lack of respect for Mother's role as Mikayla's parent.

Mother denied Father's assertion that she was unstable. She said that she had continued to receive treatment for her depression and was taking medication for it at the time of trial. In contrast to her, Mother said, when she moved back in with Father and Mikayla in Jackson, Father drank alcohol every night for the two weeks, and twice left the home with an open container of an alcoholic beverage. On another occasion, Mother asserted, Father drove from Georgia to Jackson when he did not have insurance on his truck and he had a cracked windshield. During that same time, she said, Father's driver's license had been suspended because of his DUI charge, so he was driving without a license. Comparing her circumstances to Father's, Mother said, she was the parent more fit to care for the child.

Mother called Elias King Bond ("Dr. Bond"), a psychiatrist, to testify as an expert on her behalf. Dr. Bond was contacted by Mother's attorney to give an opinion as to whether Mother was sufficiently stable and capable of being Mikayla's primary residential parent. Dr. Bond interviewed Mother in November 2004, and at that time obtained Mother's account of her history. He noted that she had undergone counseling in the past. He also said that, prior to December 2003, Mother had tried two antidepressants; however, she was not on medication at the time of the interview. Dr. Bond saw Mother's ability to recognize her problems, to ask Father to care for the child in her time of need, and to seek help for her depression as positive signs indicative of maturity. From his interview with Mother, Dr. Bond said, he saw no indications of abnormal thought patterns or emotional patterns to suggest that she was unstable. He opined that there was "no psychiatric reason [Mother] should not have custody of her child. I do not consider her having any psychiatric diagnosis at this time and, thus, see no way that I consider her unstable or unfit." Over objection, Dr. Bond stated his opinion that, generally, it is best for a "child's psychological development to be with the mother unless there are overriding reasons to feel that the mother is the more unstable parent." He said that he was unaware that, by statute, parent gender may not be considered in making custody determinations. Dr. Bond acknowledged that his recommendation was made without interviewing Father or evaluating Mother further.

Mother also called her mother, Grandmother, to testify. At the time of trial, Grandmother had been living in her own mother's home since February 2005 to help her recover from her foot surgery. She admitted that she was a recovering alcoholic and that, as a result of abuse by a male family member as a child, she had become a "control freak." Grandmother claimed that she had been sober for three years, and said that she was working on learning how to relinquish some of her impulse to control.

Grandmother acknowledged that she and Father did not get along well. She felt that Father did not like her because she "told him the way it is and [she] saw him for who he was." She said that she allowed Father to move into the basement of their home before Mikayla was born because he did not have a place to live and she was trying to "encourage the situation between [Mother] and [Father]." She conceded that, in her efforts to advise Mother, she exhibited controlling behavior, but thought that Father attempted to keep Mother distanced from her. Grandmother recalled an incident in which Father came home one evening drunk and threatened her. She had never seen Father drinking alcohol, but she found beer bottles in her garbage and assumed that they belonged to Father.

Grandmother also testified about the Easter morning when Mother gave Mikayla to Father. Grandmother said that Father had arrived that weekend with a chip on his shoulder, and that Mother became upset with Grandmother because she thought that Grandmother was not cooperating with Father. After Father left to return to Jackson, Mother "lost it and got very upset, again saying that [Grandmother] was trying to control her and Mikayla." Grandmother said that her intent was not to control Mother or Mikayla, but acknowledged that she did attempt to give Mother her insight into the situation between Mother and Father. Mother resented Grandmother speaking negatively about Father, and this caused friction in their relationship. At that time, Grandmother said, she thought that she and her husband "were the only ones who were providing [the child] with a stable home."

Grandmother conceded that her relationship with Mother had been strained in the past, but testified that, by the time of the trial, their relationship had become "totally different." Grandmother expressed appreciation for Mother's help in caring for her own mother as well as her husband's mother, who was then living in their home. Grandmother characterized Mother as "[a] very loving, nurturing mom, one who cares about her daughter," and asserted that Mother was capable of being the primary caregiver for Mikayla.

David Cerden ("Grandfather"), Mother's father, also testified on Mother's behalf. He stated that, when he and Grandmother first met Father, they were "enamored" with him and welcomed him into their home, and they "made every effort to give him every opportunity to be the father [to Mikayla]." After the romantic relationship between Mother and Father ended, Grandfather said, Father began to make disparaging remarks about Mother. Grandfather asserted that Father "took an intelligent woman, an independent good mother, and reduced her" and criticized her parenting. He and Grandmother became concerned about Mikayla's stability when Mother was moving from place to place with Father after the child was born. The tension between Father and Mother's family began when they became concerned for Mikayla's welfare. Grandfather said that he has a very positive relationship with Mother, and that it became stronger after she became pregnant. At the time of trial, Mother was living in their home with Grandfather and his eighty-seven-year-old mother. He thought that Mother would be a great mother to Mikayla, asserting that she is loving, hard-working, and would be an excellent provider.

At the conclusion of the proof, the trial court issued an oral ruling. Citing **Bah v. Bah**, 668 S.W.2d 663 (Tenn. Ct. App. 1983), the trial court applied the relevant statutory factors and

ultimately found that Father was comparatively more fit that Mother. The court noted that both parents love the child, but that the child's "love, affection, [and] emotional ties are now with the father who's had [the child] the longest." The trial court emphasized Mother's failure to become financially and emotionally independent of her parents. The trial court opined that Mother had been controlled by Grandmother ever since she was a child, and that she was still being controlled by Grandmother. The trial court admonished Mother, "[Y]ou're going to have to grow up and take some responsibility. . . . You're old enough now to do it on your own." Addressing Mother's emotional stability, the trial court stated that she "still has some issues . . . to resolve." The trial court specifically discredited the testimony of Dr. Bond, describing his testimony as "disappointing," citing his outdated view that the mother is the preferred parent and the fact that he did not interview Father. After reviewing the relevant factors, the trial court determined that Father was comparatively more fit than Mother, designated Father as the primary residential parent, and granted Mother reasonable visitation. On May 4, 2005, the trial court entered an order incorporating its oral ruling in favor of Father. From that order, Mother now appeals.

On appeal, Mother argues that the trial court did not have personal jurisdiction over her under the relevant statute, and that the evidence preponderates against the trial court's conclusion that Father is the comparatively more fit parent. Mother specifically challenges the trial court's failure to recognize the fact that she is far more willing to facilitate the child's relationship with Father than Father is willing to facilitate the relationship between the child and her. In response, Father argues that Mother waived her challenge to personal jurisdiction because she submitted to the jurisdiction of the court. Further, he notes that Mother did not include a transcript of the hearing on her motion to dismiss for lack of jurisdiction and that, therefore, the trial court's decision must be presumed to be correct. Regarding comparative fitness, Father argues that the trial court correctly applied the relevant factors in determining that he was the more fit parent.

A trial court's determination regarding personal jurisdiction is a question of law, which we review *de novo*, with no presumption of correctness in the trial court's decision. *See Noles v. Mich. Powersports, Inc.*, No. M2005-00420-COA-R9-CV, 2005 WL 2989614, at *2 (Tenn. Ct. App. Nov. 7, 2005). A trial court's determination of the facts regarding comparative fitness are reviewed *de novo*, presuming the trial court's findings to be correct, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *see In re C.K.G.*, 173 S.W.3d 714, 732 (Tenn. 2005) (citing *Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984)). Trial courts are generally vested with wide discretion regarding matters of custody. *Edwards v. Edwards*, 501 S.W.2d 283, 291 (Tenn. Ct. App. 1973).

We first address Mother's argument that the trial court lacked personal jurisdiction over her under Tennessee Code Annotated § 36-2-307. This statute provides that, in paternity and legitimation actions, "[a]ny minimum contact relevant to a child being born out of wedlock that meets constitutional standards shall be sufficient to establish the jurisdiction of Tennessee over the parents . . . ." T.C.A. § 36-2-307 (2005); *see Isaacson v. Fenton*, No. 03A01-9804-JV-00119, 1998 WL 429654, at *2-*3 (Tenn. Ct. App. July 30, 1998). Mother argues that the trial court did not have jurisdiction over her in this case because the child was not conceived in Tennessee, and because

Father had previously filed a petition in Georgia asserting that Mother was domiciled in that state. Mother asserts that Father should not be able to take inconsistent positions in Georgia and in Tennessee, claiming that Mother resides in Georgia for purposes of his Georgia petition and that Mother resides in Tennessee for purposes of the Tennessee petition.

Consistent with the Tennessee long-arm statute, section 36-2-307 permits the trial court to exercise personal jurisdiction over a defendant to the extent permitted pursuant to the constitution under a "minimum contacts" standard. *See* T.C.A. § 20-2-214(a)(6) (1994). In this case, Mother submitted to the jurisdiction of the Tennessee courts through her conduct prior to filing her motion to dismiss for lack of jurisdiction. A party makes a general appearance in a case, and thus consents to jurisdiction over her person, when she takes a position inconsistent with her claim that personal jurisdiction is absent. *See Dooley v. Dooley*, 980 S.W.2d 369, 371 (Tenn. Ct. App. 1998); *Grosfelt v. Epling (In re Grosfelt)*, 718 S.W.2d 670, 672 (Tenn. Ct. App. 1986). In this case, prior to filing her motion to dismiss for lack of personal jurisdiction, Mother filed an answer and counter-petition and entered into an agreed order regarding the parties' parenting schedules, there by submitting to the jurisdiction of the court and waiving her challenge to personal jurisdiction. *Dooley*, 980 S.W.2d at 371. Thus, we find that the trial court's exercise of personal jurisdiction over Mother was proper.

Mother next challenges the trial court's comparative fitness determination, arguing that the preponderance of the evidence does not support the trial court's decision. In applying the "comparative fitness" test, the trial court was required to consider the factors enumerated in Tennessee Code Annotated § 36-6-106, which are as follows:

> (1) The love, affection and emotional ties existing between the parents and child;
> (2) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;
> (3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; provided, that where there is a finding, under § 36-6-106(a)(8), of child abuse, as defined in §§ 39-15-401 or 39-15-402, or child sexual abuse, as defined in § 37-1-602, by one (1) parent, and that a non-perpetrating parent has relocated in order to flee the perpetrating parent, that such relocation shall not weigh against an award of custody;
> (4) The stability of the family unit of the parents;
> (5) The mental and physical health of the parents;
> (6) The home, school and community record of the child;
> (7)(A) The reasonable preference of the child if twelve (12) years of age or older;
> (B) The court may hear the preference of a younger child upon request. The preferences of older children should normally be given greater weight than those of younger children;
> (8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; provided, that where there are allegations that one (1) parent has committed child abuse, as defined in §§ 39-15-401 or 39-15-402, or child sexual

abuse, as defined in § 37-1-602, against a family member, the court shall consider all evidence relevant to the physical and emotional safety of the child, and determine, by a clear preponderance of the evidence, whether such abuse has occurred. The court shall include in its decision a written finding of all evidence, and all findings of facts connected thereto. In addition, the court shall, where appropriate, refer any issues of abuse to the juvenile court for further proceedings;

(9) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child; and

(10) Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child.

T.C.A. § 36-6-106(a) (2005). The paramount concern in such cases is the welfare and best interest of the child. *Bah*, 668 S.W.2d at 666.

Mother claims that the trial court's analysis of this issue was erroneous for several reasons. She claims that the trial court's observation that Father had maintained custody of the child "the longest" was clear error in light of the undisputed facts. She further argues that the trial court erred in failing to give weight to the evidence showing that Father would not facilitate a relationship between her and Mikayla, and that Mother had always tried to facilitate the child's relationship with Father. The most obvious evidence of Father's lack of respect for Mother's role in the child's life, she claims, was his announcement at trial that he and the child would be moving to Kentucky without consulting Mother or even informing her of this decision. Mother also noted the uncontroverted evidence that Father had been charged with two DUIs, and that he had debts of about $400,000. Finally, Mother claims that the trial court erred in failing to credit the expert testimony of Dr. Bond, who concluded that the child should live with Mother. Based on this and on the other evidence at trial, Mother argues, the trial court clearly erred in concluding that Father, rather than Mother, should be the child's primary residential parent.

In making a determination of the comparative fitness of two parents, a trial court must take into consideration "literally thousands of things." *Id.* In this case, some of the trial court's findings of fact were based on credibility determinations, which must not be reversed on appeal absent clear and convincing evidence to the contrary. The trial court correctly observed that Father had maintained custody of the child for the eleven months prior to trial, and that the child was thriving while in his custody. Regardless of whether Mikayla had been in Mother's care or Father's care the longest period of time, at the time of trial, the factor of continuity of care weighed heavily in favor of allowing Mikayla to remain with Father. Furthermore, although the trial court noted that Mother's mental health had improved, she still had unresolved issues. Father's past DUIs are a problem, but overall the evidence indicated that Father had a more stable, structured home life. He planned to live in Kentucky near his extended family where, as Mrs. Clark testified, his family would be available to support him and the child. In contrast, while living with Mother's family, Mikayla had experienced turmoil and chaos amid the tension between Mother and Grandmother. Although Father

admittedly has considerable debt, he at least appears financially able to support himself and Mikayla. In contrast, at the time of trial, Mother did not have a job and had not gained financial independence from her parents and/or her grandparents, despite her acknowledgment that living with her parents was not desirable. The trial court rightly observed that Mother had not yet taken responsibility for her own care, much less primary care of the child.

Mother rightly raises the issue of the parties' relative willingness to facilitate a relationship between the child and the other parent. This is indeed an important factor. In this case, although Father's transgressions up to trial were not overly serious, his announcement in open court a trial that he planned to move to Kentucky, without having even informed Mother, is cause for considerable concern. Father's testimony indicated that construction of his new chiropractic office was underway and that the decision had been made for some time. We can only surmise that Father chose not to consult or even inform Mother about the planned move as a matter of trial tactics.

As Mother notes, this does not indicate a willingness on Father's part to facilitate Mother's relationship with the child. Given the fact that Father's conduct in this regard prior to trial was not egregious, we cannot say that this factor should result in a reversal of the trial court's decision. However, once Father moves to Kentucky, particularly in light of the distance between the parties' homes, he has a grave responsibility to encourage a close and loving bond between Mother and Mikayla. If he fails to do so, this would surely be taken into account in any future proceedings.

In sum, reviewing the record as a whole, we find that the trial court's balancing of the relevant factors and its conclusion that Father is comparatively more fit than Mother were supported by a preponderance of the evidence. Therefore, we cannot conclude that the trial court erred in its decision to designate Father as the primary residential parent of the child.

The decision of the trial court is affirmed. Costs on appeal are taxed to Appellant Leah Joy Cerden and her surety, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE

-13-